Rockingham
No. 2008-095

THE STATE OF NEW HAMPSHIRE

v.

BRIAN A. SHEPHERD

Argued: June 11, 2009
Opinion Issued: August 4, 2009

*Kelly A. Ayotte*, attorney general (*Ann M. Rice*, associate attorney general, on the brief and orally), for the State.

*Christopher M. Johnson*, chief appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. Following his conviction for aggravated felonious sexual assault, *see* RSA 632-A:2, I(b) (Supp. 2008), the defendant, Brian A. Shepherd, appeals the decision of the Superior Court (*Nadeau*, J.) denying his motion for a new trial. We reverse and remand.

The record supports the following. The defendant and E.T. attended high school together and became friends. They never dated, but E.T. was interested in dating the defendant. The defendant eventually moved to Massachusetts to live with his father, but the defendant and E.T. saw each other occasionally.

On December 1, 2003, the defendant was in New Hampshire visiting his mother. He made arrangements to see E.T. E.T., the defendant, and some other friends went to the defendant's mother's house, where they watched television, smoked marijuana, and had dinner. They purchased beer and went to Matthew MacDuff's deceased father's trailer. After arriving at the trailer, they smoked marijuana while waiting for other guests. Four guests then left to purchase more beer, leaving the defendant and E.T. at the

trailer. E.T. and the defendant began kissing on the couch, and E.T. expressed an interest in having sex with the defendant, but they did not have a condom. Prior to that evening, E.T. and the defendant had spoken several times about having sex. They agreed that if the defendant obtained a condom, they would have sex later that night.

At around 10:00 p.m., several other guests arrived and everyone began drinking beer and playing drinking games, which involved encouraging each other to drink. They also smoked more marijuana. Everyone became intoxicated. After the drinking games, they continued talking and watching television for approximately three hours, socializing in the living room and the bathroom.

E.T. testified that she drank several beers and smoked marijuana, causing her memory of the evening to be impaired. She testified that after socializing in the bathroom, she returned to the living room to sit on the couch. The defendant "got up to go get another beer, and [she] watched him walk into the kitchen, and that was it." E.T. testified that she could not remember anything after that moment. Her next memory occurred when she woke up on a bed, laying on her back, with two men in the room. She testified that one man was having vaginal intercourse with her and another man's penis was inside her mouth. She heard someone say "I think she's going to pass out," and recognized MacDuff's voice. E.T. testified that she "[c]losed [her] eyes and hoped it was some kind of bad dream." She testified that her next memory was when other people entered the bedroom: "there was lots of commotion, like the door was open, and there was lots of commotion." E.T. was unable to move at that point and did not recall getting dressed. E.T. testified that she remembered waking up again alone in the bedroom and going to find the defendant. The defendant was sleeping in another bedroom and E.T. got into the bed where the defendant and MacDuff were sleeping.

The next morning, the defendant drove E.T. home. E.T. testified that after she went home, she began thinking about the night before and vaguely remembered the sexual activity. She initially thought the two men in the room were MacDuff and Ron Olson. She told a friend that she was adamant that the defendant was not involved. E.T. went to the Exeter Police Station and gave a statement as to what she remembered. She also complained of vaginal pain and went to see Dr. Gwendolyn Gladstone for a sexual assault examination and interview.

On December 8, 2003, Detective Mulholland interviewed the defendant at the police station. The defendant recounted the events of the evening and stated that nothing happened in the bedroom, and that he and MacDuff went into the bedroom to check on E.T., who was passed out on the bed. As the interview progressed, the defendant stated that he received fellatio

from E.T. After this interview, Mulholland believed the two men in the room were the defendant and MacDuff. Mulholland then interviewed MacDuff, who eventually indicated that the defendant had sexual intercourse with E.T. while he received oral sex. Mulholland invited the defendant to the police station to answer more questions. He asked the defendant if there was anything else he wanted to say, to which the defendant indicated that he had consensual vaginal intercourse with E.T. that evening.

The defendant and MacDuff were each charged with aggravated felonious sexual assault, alleging that they engaged in sexual penetration while E.T. was "physically helpless to resist." *See* RSA 632-A:2, I(b). The defendant and MacDuff were tried separately. At the defendant's trial, the theory of defense was that E.T. consented to the sexual activity.

The State relied upon the testimony of E.T. and Olson as evidence of what occurred in the bedroom. Olson testified that the defendant, MacDuff, and E.T. went into the bedroom after several hours of drinking. He testified that he believed the defendant and E.T. were having sex because "[t]hat's what she . . . seemed like she wanted." Olson and some other guests went to the bedroom and found the door closed and locked. Olson pushed open the door, but the defendant's foot blocked it. Olson observed the defendant having sex with E.T. while MacDuff lay on the floor. Once Olson entered the room, the defendant moved away from E.T., causing her legs to fall to the side. E.T. did not move or make any effort to cover herself.

MacDuff, who testified for the defense under a grant of use immunity, said that E.T. "had been flirting with [the defendant] throughout the whole night, and pretty much just about everybody else in the house, but it was mostly focused on [the defendant] and then moved on to both [MacDuff and the defendant]." He testified, inconsistent with his prior interview, that while in the bedroom, E.T. discussed participating in sexual activity with both him and the defendant. MacDuff testified that E.T. engaged in oral sex with him and then sexual intercourse with the defendant, during which time she was alert and responsive. He testified: "I remember hearing [E.T.] fully conscious because she was making noises and enjoying herself." MacDuff testified that he then crawled to the floor and fell asleep.

Following four days of trial, the jury returned a verdict of guilty. The trial court sentenced the defendant to serve three to six years in prison.

Subsequent to the defendant's conviction and before MacDuff went to trial, counsel for the State advised MacDuff's counsel that he had learned that Dr. Gladstone had redacted portions of the report the defendant had received before trial. The State submitted an unredacted copy of the report to the Superior Court (*Coffey,* J.) for *in camera* review. The trial court found certain evidence discoverable, permitted MacDuff's defense counsel an opportunity to review the unredacted report, and ruled during

MacDuff's trial that certain statements made by E.T. during direct examination opened the door to questions regarding the redacted information. Shortly after the introduction of this information, E.T. refused to participate in the trial and the charge against MacDuff was dismissed.

The defendant filed a motion for *in camera* review of the unredacted report. The defendant further requested a hearing to examine Dr. Gladstone about the contents of the report and circumstances of the redactions. The Superior Court (*Nadeau*, J.) granted the defendant's requests and held a hearing. At the hearing, Dr. Gladstone testified that she regularly conducts sexual assault examinations. As part of such examinations, she uses a rape kit supplied by the New Hampshire Attorney General's Office. On December 3, 2003, she conducted an examination of E.T., and produced five pages of "progress notes." She submitted the notes to the police, but intentionally omitted the bottom half of page one and all of page two. These pages included reference to E.T.'s history of depression, her treating therapists, and her request that Dr. Gladstone delay informing her mother as "[E.T.] expects her mother to be angry with her." Dr. Gladstone omitted these pages believing that the information was privileged. She also omitted the page numbers from the report. The information contained in Dr. Gladstone's complete report resulted in the discovery of other mental health records from Deborah Addario at Seacoast Mental Health.

Following the hearing, the defendant moved to set aside the verdict and for a new trial based upon the newly discovered evidence. On March 6, 2007, the trial court granted the motion, concluding: "[T]he omitted evidence led to the discovery of mental health records that provided information regarding the victim's state of mind. The defendant could have used the specific diagnoses contained in those records to rebut the victim's claim of non-consensual sexual intercourse." The trial court then granted the defendant's request for *in camera* review of E.T.'s mental health counseling records from a number of other sources. The trial court also granted the State's request for a *Daubert* hearing regarding the diagnosis contained within the records. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In November 2007, the parties deposed Deborah Addario regarding her diagnosis of E.T. The defendant learned that an evaluation of E.T. included an assessment of "[p]oor judgment or impulsive behavior resulting in dangerous or risky activities that could lead to injury or getting into trouble, more than other youth." Addario also checked boxes on a form indicating that E.T. has certain behaviors consistent with Oppositional Defiance Disorder (ODD). ODD may include the behavior of "blam[ing] others for mistakes," but this box was not checked on the form. Because Dr.

Walter Wingate approved the diagnosis of ODD, the defense then requested his treatment records of E.T. After reviewing the records, the trial court denied the defendant's request, stating: "While the doctor has diagnosed the victim with Oppositional Defiance Disorder, he specifically noted that this diagnosis did not include the criteria indicating the victim blames others for her conduct."

In January 2008, the trial court issued its final order regarding the admissibility of E.T.'s mental health status and reversed itself on the motion for new trial. The trial court concluded that the records indicating that E.T. had "poor judgment or impulsive behavior" did not include a diagnosis — instead this language was contained within a pre-printed assessment form. The trial court concluded: "While the conduct of Dr. Gladstone in redacting portions of the victim's medical records constituted a violation of the defendant's rights to discover relevant evidence, there are other avenues available to address this indiscretion." The trial court concluded that "Dr. Gladstone's conduct alone does not require a new trial." The defendant filed a motion for reconsideration, which was denied.

On appeal, the defendant argues that the trial court erred in denying his motion for a new trial because the information meets the newly discovered evidence standard. Alternatively, he argues the non-disclosure of this information violated his due process rights under *Brady* and *Laurie*. *See Brady v. Maryland*, 373 U.S. 83 (1963); *State v. Laurie*, 139 N.H. 325 (1995).

Because the standard of review in a due process analysis is more favorable to the defendant, we first address the defendant's argument that the non-disclosure violated his due process rights. We first address the defendant's claim under the New Hampshire Constitution, citing federal opinions for guidance only. *See State v. Ball*, 124 N.H. 226, 232-33 (1983).

■ Part I, Article 15 "imposes on the prosecutor the duty to disclose evidence favorable to the accused where the evidence is material either to guilt or to punishment." *State v. Dewitt*, 143 N.H. 24, 33 (1998) (quotation omitted). In *Brady*, the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Court later stated that this rule applies where only a general request for exculpatory information was made. *United States v. Agurs*, 427 U.S. 97, 106-07 (1976). Disclosure is required in this circumstance because an incomplete response to a request for exculpatory information gives the impression that the evidence does not exist. *Laurie*, 139 N.H. at 328. "In reliance on this misleading representation, the defense

might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued." *Id.*

■ Generally, to secure a new trial pursuant to the Due Process Clauses of the State and Federal Constitutions, a defendant must prove that the prosecution withheld evidence that is favorable and material. *Dewitt*, 143 N.H. at 33; *see United States v. Bagley*, 473 U.S. 667, 674 (1985). It is the defendant's burden to prove the evidence is favorable. *See Laurie*, 139 N.H. at 329-30. As we discussed in *Laurie*, however, our constitutional analysis differs from that under the Federal Constitution regarding when the defendant has the burden to prove materiality. Under the Federal Constitution, the defendant has the burden to prove both that the evidence is favorable and material. *See id.* at 328. As to materiality, the defendant must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. In *Laurie*, we found that this standard imposed too severe a burden upon the defendant because "the prosecutor decides which information must be disclosed to a defendant in compliance with constitutional mandates." *Laurie*, 139 N.H. at 329. As a result, we held that, "[u]pon a showing by the defendant that favorable, exculpatory evidence has been knowingly withheld by the prosecution, the burden shifts to the State to prove beyond a reasonable doubt that the undisclosed evidence would not have affected the verdict." *Id.* at 330.

■ Thus, under *Laurie*, the defendant has the initial burden to show that the evidence withheld by the State was favorable. *Id.* "Favorable evidence is that which is admissible, likely to lead to the discovery of admissible evidence, or otherwise relevant to the preparation or presentation of the defense." *Dewitt*, 143 N.H. at 33. Favorable evidence may include impeachment evidence. *See Laurie*, 139 N.H. at 327.

■ Once the defendant proves that the evidence is favorable, the next issue is whether the State knowingly withheld the evidence. If the defendant carries this burden, there is a presumption that the evidence is material and the burden shifts to the State to prove, beyond a reasonable doubt, that the undisclosed evidence would not have affected the verdict. *See State v. Lucius*, 140 N.H. 60, 63-64 (1995). If, however, the defendant fails to prove the State knowingly withheld the evidence, then the defendant retains the burden to prove that the evidence is material. *See Dewitt*, 143 N.H. at 35. When the defendant retains the burden to prove materiality, we apply the federal standard; *i.e.*, the defendant must demonstrate "a

reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see Dewitt*, 143 N.H. at 33.

We initially address whether the defendant here met his burden to prove that the undisclosed information is favorable. The undisclosed evidence included information that E.T. has a history of depression and had recently seen mental health counselors. As we have stated, "Information pertaining to a witness's mental stability may be relevant to credibility, and therefore useful as impeachment evidence at trial." *Dewitt*, 143 N.H. at 34 (citations omitted). On cross-examination, the unredacted report could have led the defense to question E.T. as to whether she has "poor judgment or impulsive behavior." Consistent with our decision in *Dewitt*, we conclude that the undisclosed evidence was favorable. *Id.* at 35. "[W]e recognize that a witness's mental health *may* be relevant to that witness's credibility, and where, as here, the witness is adverse to the defendant, such information is sufficiently favorable to the defendant to trigger the State's obligation to disclose it." *Id.*

Although we have recently stated that the trial court may prohibit cross-examination of a witness as to his or her mental health, *see State v Fichera*, 153 N.H. 588, 601 (2006), our inquiry in this due process analysis is not whether the evidence is admissible, but instead whether it is favorable — *i.e.*, whether it would have helped the defense in the preparation or presentation of its case, *see Dewitt*, 143 N.H. at 33. Although the defendant may not have been able to introduce evidence of E.T.'s mental health history at trial, the evidence is sufficiently favorable to require disclosure. We conclude that the defendant has met his burden to show that the evidence within Dr. Gladstone's report was favorable evidence.

We next consider whether the State knowingly withheld the exculpatory evidence. First, the State does not contest that Dr. Gladstone's report falls within the State's duty to disclose under *Laurie*. Second, while Dr. Gladstone testified that she redacted the information because it was privileged, the privilege issue was not raised on appeal. Third, even if Dr. Gladstone believed that the evidence was privileged, she could have obscured the privileged portions with a marker, allowing the document to remain physically intact, thereby putting the reader on notice that information had been redacted. Instead, rearranging the notes and omitting page numbers gave the false impression that the report was complete.

Because the State knowingly withheld favorable evidence, the burden then shifts to the State to prove, beyond a reasonable doubt, that "the

undisclosed evidence would not have affected the verdict." *Laurie*, 139 N.H. at 330. We cannot conclude that the State has met this burden. The uncontroverted evidence at trial included that E.T. and the defendant went to a party together where they both drank heavily and smoked marijuana. They discussed having sexual intercourse prior to the party and intended to have sexual intercourse that evening if the defendant could find a condom. Olson testified that E.T. was flirting with the defendant all evening and he observed her walk into the bedroom with the defendant and MacDuff following her. He assumed that E.T. and the defendant were having sex because "[t]hat's what she . . . seemed like she wanted."

The State's case hinged on E.T.'s credibility and whether she accurately described her level of consciousness. The undisclosed evidence could have led to a line of impeachment questioning that may have affected the verdict. At trial, defense counsel asked E.T., "So could it have been your master plan to get [the defendant] drunk and get him into the room and have sex with him?", to which E.T. replied in the negative, saying, "I'm not that kind of a person." This answer begs the question as to what kind of a person E.T. is. Provided the defendant had the evidence of E.T.'s mental health history, he would have had a good faith basis to ask her if she is the type of person who has poor judgment or makes impulsive decisions. The defendant could have asked her if in fact she is the type of person who would participate in risky sexual behavior. The jury could have then observed her answers and demeanor to assess her credibility.

Moreover, the redacted information included E.T.'s reaction to Dr. Gladstone informing her mother of the sexual activity:

> [E.T.] feels safe going to spend time for a few days at [her friend's] house and wants to get some clothes from her house [first]. She asked me [Dr. Gladstone] to inform her mother of what happened but asked me not to do so until she picked up her clothes in order to avoid a confrontation. She expects her mother to be angry with her "we don't have a good relationship" and said that if any of the medication would cost her mother "a penny, she won't pay for it."

Had the defense been aware of this statement, it likely could have elicited it from E.T. or Dr. Gladstone and then at least argued to the jury that it is unusual for a sexual assault victim's mother to be angry with the victim.

Although we recognize that the State's evidence at trial was not limited to E.T.'s testimony, and thus the verdict did not rest solely on her credibility, we cannot conclude that the other evidence was of an overwhelming nature so that the undisclosed impeachment evidence would not have affected the verdict. The State's other evidence included Olson's observations of E.T. lying on the bed motionless and the defendant's

statements to the police. As to Olson's observations, there was no dispute at trial that E.T. was intoxicated. The issue was whether or not she was physically helpless to resist. E.T.'s behavior, once Olson opened the bedroom door, could have been consistent with both intoxication or helplessness. Moreover, the defendant originally denied any sexual activity with E.T. He later changed his story, claiming the sexual activity was consensual. The defendant, however, was aware that E.T. was alleging that she was raped, and thus any decision to deny sexual activity could have been based upon his fear of being charged with the alleged rape.

Given the State's heavy burden, we conclude that the defendant's due process rights entitle him to a new trial. Because we reverse based upon the defendant's argument pursuant to his due process rights under the State Constitution, we need not address the defendant's arguments pursuant to the Federal Constitution or the newly discovered evidence standard.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.